The Honorable Susan Baye has us in presiding. Please be seated. Your Honor, the second case of the morning called 2-12-0755, Fogel v. Fogel. On behalf of the appellant, Mr. Christopher McCoy. On behalf of the people, Mr. Scott Jacobs. All right, Mr. McCoy. May it please the Court, Counsel. My name is Christopher McCoy from the Office of the State Appellate Defender, and I represent Mr. Fogel. Mr. McCoy, if you could, could you keep your voice up a little bit? This room is taking your voice right up there. Sure. Thank you. There are two issues presented in this case. The first one concerns a search-and-seizure question, and the second involves the mistake-of-fact defense. On the first issue, Mr. Fogel's Fourth Amendment rights were violated for two reasons. First, because the seizure was impermissibly prolonged, and second, because his consent was not voluntary. Mr. McCoy, how long did this traffic stop take? According to the record, unless the record is wrong, it says about two and a half or three minutes. I mean, at my age, that is a long time. But, I mean, how can we say that it's prolonged at three minutes? That is the correct amount of time. However, time is not the only consideration. Even under the duration prong, it's a totality-of-circumstances test in which courts look at the total time, but they also look if officers were acting diligently, and they look to the individual circumstances for each stop and what was required to be done in that stop. Are you challenging the actual stop where he failed to? No. And are you saying that once they made the stop, they had to first deal with the traffic offense before they questioned him about something else? Is that what you're saying? Yes. That's the basis on which you're saying that it unreasonably prolonged the stop? Yes, Your Honor. And if we could take a counterexample, if the police officers, instead of doing what they did here, if they had first worked through the traffic violation, asked for Mr. Fogle's driver's license, did whatever investigations necessary for a failure to use a turn signal, and then before giving him back his driver's license and his paperwork, if at that time they engaged in this unrelated series of questioning, then clearly the stop would have been prolonged because the purpose of the stop would have been completed. So here the officers are trying to do the exact same thing, but simply in the opposite order. They shouldn't be allowed to do indirectly what they can't do directly. But isn't that what some of the cases that have been decided have basically told police officers, that once you give the paperwork back, once the substance of the stop is done, you better be done. So in order to get to the issue that was really in front of them, by the way, didn't you just get dropped, or didn't you just drop off so-and-so, and, you know, what's that all about? They had the reason to stop. They asked the very brief question. He says, yeah, I just dropped him off, and that gave them a suspicion of something else. So how, again, I'm still, we tell them not to give the paperwork back, or decisions tell them not to give the paperwork back, because once you do and then you go on to something else, you're prolonging the stop. So can it be viewed that they actually listened and did it the right way, possibly? Well, I don't believe so. I believe if you look at people v. Cosby, once you have given the paperwork back, and then it's clear that a second seizure hasn't occurred, you tell the defendant you're free to leave, but, so, for example, in this case, they do the traffic stop, give the defendant his driver's license or the ticket, and then say, okay, you're free to leave, but would you mind if we asked you a few questions? That's not a second seizure, and that would not prolong the initial seizure, which has ended by returning the paperwork. And then they could ask these questions, and Mr. Fogle, if he wanted, could answer them, or he could go about his business. So that would be one possibility for what the police officers could have done differently. The second possibility was if they were to actually work towards the completion of the traffic stop and then perhaps ask these questions during some downtime. There are three officers present here, and never once did one of those officers do anything relating to the failure to use a turn signal. So perhaps if one of the officers was asking about, or one of the officers was running the driver's license, if another officer then asked these questions, that may have been permissible. But that's not what happens here. The officers never, not one of the officers did anything relating to the actual failure to use a turn signal, and therefore they were never doing anything to work towards the completion of the traffic stop. And you're saying the authority for saying that that's required is Cosby? Or what case says that that has to take place first before any other questioning? Well, there's no case where there's been this exact scenario. But if you look at what Cabaly says and what people v. Harris say, even people v. Baldwin, the search is prolonged if it goes beyond what's required to complete the purpose of the stop. Here they're not doing anything related to that purpose. So necessarily they're prolonging the duration of the traffic stop. What if the stop occurred because of the failure to use the turn signal? They walk up to the vehicle, and sitting on the console is a beer, an open beer. Do they still have to talk about the turn signal? Or now that they've seen the open beer, can they say, oh, wait a minute, is that an open beer? Or do they have to say, I'm going to give you a ticket for this, and I'm going to talk to you about that open beer in about ten minutes? No. In that case, they would have something immediately apparent. In the Supreme Court case of Wren, which allows for contextual stops, that's what happened. But here we don't have that immediate sort of plain view seeing of some contraband here. When they approach, the only thing they have is the failure to use a turn signal. And the state in its brief admits up to that point all the officers had, besides that, was just a hunch about some perhaps drug transaction. So in that case, they could start questioning about the open container of alcohol, but that's not the situation we have here. Well, they knew that the person he had just dropped off had some police activity in his past. Well, they didn't know that until they started questioning Mr. Fogle about it. Well, why were they watching that particular location if they didn't think that Spud or whoever this person is had some issues? Well, they actually were watching it for some type of underage drinking parties is actually what the officer testified to. And clearly Mr. Fogle was not engaged in underage drinking parties. And they knew nothing about that Spud had been in the car until they started talking to Mr. Fogle. Officer Madigan said all he could see of this passenger was just his legs in the car. So they did not know who the passenger was before they started going down this line of unrelated questioning. Well, it says defendant admitted that he knew the passenger's name was Spud and the police officers knew Spud was known for drug dealing in the area. That's correct, but again, that's after the officers have started this questioning. After the officers are not working towards the traffic stop, they're going down this unrelated road. And you're saying even though from the time they stopped him to the time they arrested him was 1 minute 40 seconds, that that was unreasonably prolonging the stop because of the nature of the questioning? That's your position? It is, just a minor. I believe it's around 2 1⁄2 minutes. Obviously, that's not that long. That was, I thought the entire stop, but maybe I misread it. I thought there were two different numbers. How I calculated it was 2 1⁄2 minutes from when the car was actually stopped to when the defendant was arrested. Yeah, so if it's going a shorter window, that might be correct. But that is our position. And, in fact, if time were the only consideration here, and if all we looked at was just using a stopwatch to see if the Fourth Amendment's been violated, what we would have is during whatever time is reasonable for a traffic stop, so say it's 5 minutes, say it's 10 minutes, police would be free during that time to just go on fishing expeditions to their heart's content. And this is not a situation that we should be trying to promote because it would not be beneficial to both the citizen and to the police officer because what you're doing, as exemplified in this case, is you're creating a deceptive, hostile environment. The motorist doesn't know why they've been stopped. The police officers here were doing their best job to implicate, to not mention the traffic violation and to imply that the true reason was based on some type of narcotics investigation. And so you have motorists not knowing why they've been stopped, and then you have motorists suspecting, well, when will I be free to leave? What have I done here? And being suspicious of the officer's motive. So as I said, you're creating a hostile environment. Well, here this was not a hostile environment. I mean, I think the record shows it was pretty amicable, and, I mean, there wasn't any resistance to when they asked him what he had in his pocket, or, you know, he reached in. Well, it's certainly not a forthcoming environment. Police officers are being encouraged to be deceptive about really why they're seizing this man. And, again, it would really encourage pretextual stops because you would have this five minutes or ten minutes when you're simply free to, again, go on fishing expeditions without any suspicion and just based on this, based on the traffic stop as a true basis and using that then, again, to go on a fishing expedition. So we don't, we should put on blinders to the fact that the police officers were observing this location for illegal alcohol use. They saw Spud, a known drug dealer, being dropped off by this defendant who then, you know, for their purposes, forgot to, you know, conveniently and actually forgot to use his turn signal for a turn. So they should disregard what they saw earlier, or should they ask a question about that? Or can they ask a question and not prolong the matter? Before directly answering your question, one quick point. Again, to emphasize, they didn't know it was Spud. Until they started asking the defendant, they don't see Spud out of the car. They don't know who this other person is. So, again, when they approach and the statement is in the brief, all they have is a hunch. Now, can they ask a question? Yes, they can. But they must do it without prolonging the traffic stop. And the way to do that is I think two ways would be give the defendant back his driver's license or the ticket and then say he's free to go and then ask for his consent to stay and have a consensual encounter, consensual conversation with the police officers. Or the second option would be, again, during some perhaps down time, during the stop to do it then. But here where no one is doing anything to work to the completion of the traffic stop, in fact, Officer Downing doesn't even know the true reason why, doesn't even know why Mr. Fogle is being stopped to begin with. When that doesn't happen, it necessarily prolongs the duration of the traffic stop. And it's important to remember that a traffic stop is an exception to the warrant requirement. And here, if time weren't the only factor, it would be really turning this exception on its head by allowing it as just a free-for-all for whatever investigation the police would like to go on. And moreover, setting that aside for one second, the officer's conduct also independently triggered the Fourth Amendment because it infringed on a legitimate privacy interest. And this is similar to what happened in the Alvareen case. The officers asked Mr. Fogle who he had been with. They asked him to search his vehicle. They asked to search his person. All of these things are not limited to contraband in the same way that a dog sniff will be limited or a warrant check will be limited and people be harassed. And so because of that, Mr. Fogle's privacy rights, his legitimate interest in privacy, has also been implicated. And for this reason as well, the scope of the traffic stop was impermissibly extended. Well, the police don't know it's Spud. They have a suspicion. They have a hunch. They see legs. Say, who was that that you just dropped off? I'm not going to tell you. But that's not what happened, right? He said that was. Yes, he says it's Spud. Now there is something beyond a reasonable expectation, don't you believe? I don't believe that that's a reasonable suspicion. But even setting that aside, they'd already started, again, on this route of prolonging the traffic stop by asking these unrelated questions. And even, okay, so he says it's Spud. All they saw was two people in the vehicle. And he says he was giving him a ride. He gives an innocent explanation for what he was doing. The fact that a person is in the same car as a drug dealer can't be for all time reasonable suspicion to search that car and to look at that person for whatever they want. So I don't believe that that was reasonable suspicion even after he said that Spud was in the vehicle. Let's look at mistake of fact. Sure. Just on this point, the defense presented the mistake of fact at trial. The entire defense revolves around that affirmative defense. And the trial court explicitly refused to consider it. The court did so. Well, that's what confuses me about this particular case. The trial court spent a lot of time talking about it. And so are you saying the trial court didn't even consider it or didn't in a vernacular buy it? Which is the issue? He didn't consider that it would apply to the situation. It's not that he just weighed the credibility and didn't believe the defendant's testimony. He said, well, it doesn't matter because what the defendant thought was illegal in either instance. So what Mr. Fogle is asking here is not strictly speaking on the second issue now. He's not asking that his conviction be reversed. Instead, he's simply asking that he gets his day in court where his defense can actually be considered, where the trial fact can weigh the credibility and determine if that defense applies in the case. All right. He said it doesn't apply because it's illegal either way. Marijuana is illegal. A controlled substance is illegal. Are you saying that the court confused marijuana with a controlled substance or simply said both of them are illegal substances? And therefore, he should have known he would have been in trouble. It wasn't really a mistake of fact. The court made a mistake of law in thinking that the belief that something is, the belief that it's cannabis instead of cocaine was sufficient to make the mistake of fact defense not apply. So even if Mr. Fogle really believed it was cocaine, that doesn't matter. That was the court's position. And because we have two separate statutes and cannabis is explicitly not a controlled substance, there was some evidence to suggest that Mr. Fogle did not knowingly possess a controlled substance. And therefore, the affirmative defense of mistake of fact should have been considered. So knowing means you have to know the exact substance that you have. I mean, doesn't that mean that in some instances you might need a chemist to determine that? No, no. Most people can distinguish between marijuana and cocaine. Here we have a sort of unique situation in which Mr. Fogle is given the substance at night. He puts it in his pocket without looking. It's in a plastic bag. So it's not enough. You don't need a chemical analysis. You just need to know was this a controlled substance. And here there's some evidence that he did not know it was a controlled substance. He knew it was illegal, an illegal substance. Yes, but as demonstrated by the Crane case and the Hall case, just knowing your acts are illegal does not mean that the mistake of fact defense cannot be raised. Would your argument change if it had been a distinction, say, between heroin and cocaine? Yes. In that case, then, the mistake of fact defense would not apply. Because it's all a controlled substance? So really you're hanging your hat on here that cannabis is not a controlled substance. Yes, and that's because there are two separate statutes. And the Illinois legislature, in enacting the separate statute for cannabis, did so to sort of, they say, excise it from the general criminal code. And so because there is this distinction between cannabis and controlled substance, the defendant needs to know that it was, in fact, a controlled substance. Well, didn't the trial court find that he actually did know that, that he had indicated that he had gotten cocaine previously from this drug dealer? He did say that. But again, the court's holding was that it's illegal in either instance. So the court never considered the mistake of fact defense and didn't believe that the mistake of fact defense could apply, even if you believe Mr. Fogle. Well, I think Justice Hutchinson brought up the possibility that maybe what the trial court did is not by the mistake of fact defense. And based on the finding, the factual finding the trial court made, isn't that really a possibility here? No, I don't believe so. So if you look back at the trial court's holding after the trial and at the post-trial motion, he explicitly says that he is not considering this defense. This court recently decided, People v. Brown, where the person put on a pair of pants that had something in the pockets and he said, well, these weren't my pants. They were my brother's pants. I didn't know what was in them. Are you familiar with that one? I unfortunately am not familiar with that. I believe Justice Jorgensen is. Unless there are any further questions? No, thank you. Mr. Fogle requests that this court reverse his conviction outright based on the search and seizure violation or alternatively remand this case for a new trial where his mistake of fact defense can be considered. Thank you. Mr. Jacobson? And our condolences to your colleague and thank you for being able to step up and do the argument this way. Thank you very much. I appreciate that. Madam Presiding Justice, may it please the court, I think it's a little bit apropos that we're having this sort of argument on the heels of Thanksgiving weekend. All of us having spent Thanksgiving with our families, and I'm sure if your family is anything like mine, you've dealt with a lot of people of a lot of different age ranges, some young, some old. But all of them absolutely convinced that whatever the topic is, that they're absolutely right, that their position is reasonable, that yours isn't, whether it has anything to do with Obamacare or what we're watching on television. I think there's a lot of that sort of attitude going on in this argument that's being raised by the defendant. The defendant thinks that police officers can only entertain one thought in their mind at any given time, that they can only be pursuing one objective at any given time. To do so otherwise would be unreasonable. To have a traffic stop where officers have probable cause to seize the defendant lasts for approximately two minutes and 30 seconds. The defendant thinks it's reasonable to subject that to a terror analysis, and then, of course, based on that, that he was unreasonably seized for entirely too long a period of time. Well, it is a traffic stop, and we come as a culture to not only dislike traffic stops, but to expect that they're going to happen once or twice in our life. Sure. And as much as we hate them, after years in traffic court, before I got here, people would say, you didn't even tell me what I was stopped for. Or the one that they really didn't like was, the officer walked up and said, do you know what I stopped you for? That made them angry. Sure. So, I mean, it's a traffic stop. Shouldn't they say, I'd like to see your license and registration before they get into, how's your day going? It would be nice. What I think is interesting is, if you look at the great traffic stop cases, I wonder if Chief Justice Rehnquist had ever been stopped in his life. Because if you read Ren v. United States, Ohio v. Robinette, they sort of give the indication that the police officer conducting the traffic stop doesn't need to tell the driver why they've necessarily been pulled over, offer some pretext for us to argue about later on. I mean, there are a lot of things going on. And I think what often gets lost in the shuffle is that those of us who have been stopped before are familiar with the garden variety traffic stop. But officers are dealing with many different types of traffic stops on the spectrum of danger. Mr. Jacobson, this is the issue for me. Yes, ma'am. If you take away the turn signal, let's assume he did use his turn signal. There's no base, no traffic violation. Would it be your position that the police could have stopped him and then questioned him as they did? I wouldn't say. Let me see. Yes, as a matter of fact, it would be. Based on? Based on the fact that they had their hunch. Well, they had the unparticularized hunch.  They begin the conversation, assuming a conversation. The question is, was there a basis to pull them over in the absence of a traffic violation? You know what? To be honest with you, no, probably not. Okay. So he had a traffic violation. Yes. Pull him over. Do nothing about the traffic violation and immediately proceed to ask him about anything and everything else. Sure. Why is that okay? Partly because of that water. I think also, well, see, this is the problem. And I understand we're dealing with, you know, these issues at the margins between probable cause and an investigative stop. Whether or not we think the officer might have been wiser in choosing a different course of conduct. We're stuck with what he did. Yes. He observed traffic, but he, or I think there were two in the car anyway. Yes. They observe a traffic violation, and that's not contested. Right. Pull someone over for an insignificant traffic violation, a turn signal. I mean, it's not a DUI. It's not reckless driving. It's a turn signal. And without even asking for a driver's license, I immediately begin to ask you about where have you been? Who were you with? What were you doing? How was that a traffic stop? What's the purpose of that stop? The purpose of it? By doing this, are we saying that if you commit a traffic violation, everything is now on the table? Police can ask you about anything and everything that you've been doing, and they can do that for some period of time without beginning to process this alleged traffic violation? Sure. Is that what we're saying? Let me put it this way. We know the rule that the officers are running up against. The rule coming out of Gonzales-Cabal is that once the paperwork is returned to the driver, the stop is over. The officer can't go any further. Right. So when the officers pull this defendant, or any defendant, over, and they pull him or her over for a traffic violation, but they're really looking for something else as well. The stop has two purposes. We call it a pretextual stop. You use that word. I don't know that I necessarily would. Okay, let's be honest. Yeah, sure. Why not? Okay. I don't really think that it matters. I mean, the officers have two ideas going on in their head. One, I pulled this person over for various and sundry traffic violation. I understand you're very artfully putting this out. They're doing two things. Right. But how long can they ask questions unrelated to this traffic violation before it's, as counsel says, unduly prolonging it on the front end? It's like, okay, I won't have to give you your driver's license back for another ten minutes maybe because I haven't even asked you for it yet. We're just going to talk about all this other stuff. And where is that okay? Okay. To answer your question, I would reach back to Ohio v. Robinette in that the officer doesn't necessarily have to inform the driver that he or she is free to decline to consent to search, or the officer doesn't necessarily have to inform the driver they're free to go. Then we go to our Shankloff factors and we start analyzing the situation that way. But if I've stopped you for a traffic violation, don't I have some inherent obligation to begin to process that? To begin to process it. Like, can I have your driver's license? Start to write a ticket. Maybe run a check on the plates. Sure. And when they don't do that. The Fourth Amendment doesn't require the best police procedures. How about any police procedure with respect to traffic, given that that's what they say they stopped him for? I don't know why the officer didn't ask those questions right off the bat. Let me put it this way. Would it have been better for him to do that? Sure. The fact that he didn't is constitutionally unoffensive, though. If this had happened, you know, if there was a 15-minute conversation roadside, you know, if it really veered wildly off course, problem. We may not know exactly where the line is to know when it's been crossed. Two and a half minutes, different story. I mean, it just fundamentally is. The time saves the day for the state. I think a lot of things here save the day for the state. First of all, I don't think anything is more compelling, at least from a Fourth Amendment standpoint, than the fact that this defendant was seized with probable cause. Under Atwater, Virginia v. Moore, the officer had every right to do what he did. Now the defendant takes this and turns this into a Terry-style case. It may have been a Terry as to everything related to Spud, but at the moment the defendant was pulled over and the questioning began, we are in probable cause territory. All right. So I don't think, I think that it's a mistake to say that just because there may have been an investigatory stop on the issue of drugs, that necessarily sort of taints the valid stop for the traffic offense. Okay. I just, I mean, I think the defendant's trying to pigeonhole it into the argument that he would like it to be rather than the facts that we have in the case. Well, when they, the officer who actually does the stop, I think it's radio to do the stop or something like that, but somebody comes up pretty quickly after that, somebody in the task force or whatever it is, and he starts the questioning, does the fact that they're observing this house and they see him near that house dropping a person off, does that add anything? I mean, Justice Jorgensen's concerned that every time a police officer stops us for speeding, that would probably be me, that he can ask me about, you know, so what drug did you use yesterday? Or when were you last drinking? I mean, that probably wouldn't wash. But does it have, does your argument have something to do with the fact that they were watching this house? And is that what gives this some permissibility? I think it factors into it a little bit, certainly. That factors into the separate drug investigation for which the terror, I mean, to the extent that there's a terror component here, you know, it's under the umbrella of the fact that the defendant has been seized pursuant to probable cause for the murder violation. Well, why didn't they ask him who was in your car? What was the purpose of who? And that might not be the exact question, but it's something like, hey, who was that that you were with? My brother-in-law is a police officer, so I want to choose my words fairly carefully. But I don't know. I don't know why the officer asked that question. I mean, I know the series of questions that I would have asked. I know that it would have been different. I know that the order might not, you know, it probably would have been different. But was it constitutionally offensive? Was it a basis for granting the defendant's motion to suppress? No. Here's where ultimately I think we have one of those where the rubber meets the road problems. In Gonzalez and Cabalas and that whole milieu of cases, courts fashion the rule that once you give the driver back his paperwork, he or she is free to go. Officers may not expand the scope of the stop at that point. So it literally is a race against time for officers to, I mean, because there is a legitimate investigative purpose there. They are attempting to investigate a crime. A turn signal violation. Shouldn't the questioning be confined to the basis for the stop? No. No, I don't believe that it should be. Confined solely to that? No. I mean, as I said, yes, he's been seized pursuant to probable cause to believe that there was a moving violation. But they're not restricted to talking about those things. I mean, let me put it this way. If the officer pulls the defendant over and then, you know, the officer just asks the defendant, hey, you know, by the way, where are you coming from? Where were you the night before? Whatever. The defendant spontaneously confesses to a murder. I don't think anybody would have found the initial question to be offensive. Simply put, just because he stopped for one thing doesn't mean that that is the only subject under discussion. I mean, we might naturally be discussing things related to the defendant's license, to whether or not his tags are expired, to something hanging down from the windshield that could be a separate basis for stopping the vehicle. I don't see any reason. I think the Fourth Amendment rule in this regard is so broad precisely because we are not supposed to be dictating, at least under the guise of Fourth Amendment law, what can and cannot be said in the context of an investigatory stop. We would hope that it would have something to do with fleshing out the officer's suspicions, hopefully trying to dispel them as quickly as possible, hopefully either getting the citizen back on their way or enabling the officer to develop details to possibly take them into custody for another crime. But I would like things to be, I think things can always be quicker and more efficient. I'm sure this Court has seen many more traffic stops than I have and probably feels the same way. But that's not a basis for saying we're going to, as the defendant suggests, distort the rules concerning the Fourth Amendment in this particular situation. Do you want to talk about the mistake effect briefly? Absolutely. Of course. Or whatever you'd like to say. Okay, so having only gotten the case for a very short period of time, maybe if you could answer a few questions for me, that would help me to be able to answer them for the Court. All right, well, let's talk about this. There seems to be, and I think counsel acknowledged it when he argued, that we have two statutes. One, a controlled substance statute. One, a marijuana statute. And marijuana is not a controlled substance. So as he made this, it's an illegal substance, but not a controlled substance. So as he makes, you know, as he says, oh sure, go ahead, the judge is supposed to consider that, well, he probably thought he had marijuana in his pocket and he wouldn't mind taking the marijuana bust, but he had no idea that he had a controlled substance in his pocket. Doesn't the testimony, if you've had a chance to look at it, but you probably didn't because we might have had the record, might belie that he did get cocaine before, he has used cocaine from probably this dealer, and this is not unusual, that it was one of the commodities that that day paid for the ride. Let me, okay, so as marijuana becomes legal in Illinois, it eventually will be. In the federal sense, marijuana is covered under the Controlled Substances Act, the Federal Controlled Substances Act. It is a controlled substance in that. But not defined by 402 as a controlled substance. Right. That's the issue. But it is nevertheless, it's, the issue for me is not that it's necessarily an illegal substance. It's that I don't see this as a defense. If the defendant wants to argue it, that's fine, and we can argue that there are other facts and circumstances in the case that might belie that argument at trial as a factual matter. I don't think it's a legal defense. I mean, there are certain recognized defenses as a matter of law that all would, that require the defendant to admit to the substance of the allegation, but then point to something else to inevitably diminish his culpability to the point where he's no longer liable for the crime. Insanity, duress, coercion, a subspecies of that would be entrapment, defense of others, defense of self. Mistake of fact, unilateral mistake of fact is not one of them. It would be in a, I suppose when we get into the situation where we're discussing between first degree murder, second degree murder, and voluntary manslaughter is those are specific intent crimes. But the possession of a controlled substance or possession of cannabis is a, it's a general intent crime. The fact that the defendant intended to possess something, I mean he clearly intended to possess under the facts of this case, but in the abstract, the fact that somebody intends to possess something and then they end up possessing it, more likely than not yields the inference that that possession was knowing and intentional. But he intended to possess marijuana, according to the theory here. And marijuana would certainly carry a penalty, just not as significant or severe. Well, also too, I think we're talking about, I mean physically, your Honor's involvement in criminal court, we are talking about two substances that in context look and feel and are nothing alike. But it's dark. It's dark. It's nighttime. You know, Spud pops him something in his pocket and says, thanks Spud, and takes off. You know what, I'm veering off the course that I tried to set for myself, so let me just say this. I don't think that this will ever be a valid legal defense to a possession charge. Possession of what? A controlled substance or possession? Either. Either. Possession of a lookalike, possession of methamphetamine. You know, we could be under the same situation. It is a factual issue for the defendant to raise at trial, but it is not something that would vitiate his criminal conduct. He intended to possess a substance. He ultimately is found in possession of a substance, and I'm sure that can yield a reasonable inference that he got what he asked for all along, that this wasn't a mistake. But more importantly, I think the argument that it is a mistake, you know, or that he was somehow let down is misguided. It does not enable him to, in the classical sense, like an insanity defense or an entrapment defense, it does not vitiate his criminal conduct. It does not excuse it. It does not cause anybody to say he's not responsible for this crime here. What if Spud or anybody that he drove gave him money instead? And today, oh, my goodness, I thought he gave me a $20 bill. Instead he gave me a little green package. Is that going to be a mistake of fact? No. I don't think so. If he's never given him any drugs before? I don't believe in it. Where we have a general intent crime such as this, I do not believe that a mistake of fact defense will ever lie based on – will ever lie in those circumstances. And it has nothing to do with – it really has nothing to do with the facts of the case or how well the defendant and Spud know each other. I mean, the defendant did something in expectation of receiving something. Whether or not that something turned out to be illegal or not illegal or a lookalike substance or whatever isn't really the point. The point is he did this act. He received this remuneration for it. We get there because – we get to the point of assigning blameworthy knowledge to that because this is what – this was the agreement that he negotiated for. And this was the object that he got. Okay, so it's not that he knowingly possessed cocaine, but he knowingly possessed an illegal subject – or illegal substance, but thank you. Right. And what's different about that is it's not the issue of whether or not he's 100 percent guilty as charged for the crime – for the specific substance alleged in the chargement instrument. It's that a defense that I wanted X but instead I received Y is simply not the type of defense that would vitiate his conduct. It doesn't – it's simply – as I said, with Thanksgiving, I saw a lot of – I spent a lot of time with the family this weekend. I did see a lot of Sesame Street. One of these things is not like the other is the bottom line. The defendant, for whatever reason, accepted the drugs, left the scene, that he might have misgivings or that Spud may be a bad drug dealer does not prevent the defendant – or does not prevent society from holding the defendant liable for his own conduct.  Thank you very much. Thank you, Your Honor. Thank you. Three points. First, on the mistake-of-fact defense – a mistake-of-fact is a statutorily provided affirmative defense. It's in 720 ILCS 5-48A, and it's – if it negates a mental state, here it negated the mental state that he knowingly possessed the controlled substance. Well, I mean, I think counsel's saying – and the brief is consistent with what he's arguing here today. The issue isn't I knowingly possessed heroin, I knowingly possessed cocaine, I knowingly possessed marijuana. It's just I knowingly possessed a drug. Now, the penalty is different, but I knowingly possessed a drug. If it was two different controlled substances, that argument would be correct. But when we're dealing with controlled substance, cocaine, and then cannabis, which is regulated in a different statute, which is not a controlled substance, then this mistake-of-fact defense negates that mental state. The second point, one thing I was not able to get to on earlier, was the actual consent here, and that it was not voluntary. The consent we're challenging is a nonverbal action when Mr. Fogle removed the substance from his shirt pocket. Before this, Officer Downing did not ask him, can I see what's in your pocket? Would you mind showing me what's in your pocket? He asked him, what is that in your pocket? Mr. Fogle took out an insurance card. Unsatisfied, Officer Downing persisted. No, what is it? There's something else in your pocket. What is it? Well, he told him he saw a bulge there. Yes, yes. What is that bulge in your pocket? And so this nonverbal act of consent, which the Illinois Supreme Court and people of the Anthony says we must look at more strictly, more scrupulously than verbal consent, was not voluntarily giving up his right. It was just submitting to the officer's implied authority. And the overall context- Well, how do you make that distinction? I mean, he didn't hesitate a minute. They asked him and he reacted. I mean, how do you- As I recall, they weren't in uniform either, were they? Officer Downing was in uniform. That's right, one was. I believe two of them were. Officer Downing was in uniform, though, in any case. And, again, he didn't- His persistent questioning was not such that it would appear that Mr. Fogle had a choice whether or not to show him what was in his pocket. He tried once. But he could have said no. Why couldn't he have said no? He could have said no, but, again, it's looking at the circumstances here. We have three officers- Guns weren't drawn. He wasn't handcuffed. I mean, he wasn't arrested. So, again, where do we draw the line? What's the distinction? Well, we have three- I didn't- We have to look at the circumstances. Here, three officers- The totality of the circumstances. Yes, three officers surrounded his car. They took him out of his car. This does not look like a normal traffic stop for failure to use a turn signal. And the officers throughout their questioning, again, never say anything about the actual traffic violation. Instead, they're doing their best to make it seem like this is part of an archivist's investigation. Officer Madigan says- After he says that Spud is a drug dealer, tells Mr. Fogle, quote, So you probably know why I went to search your car then. Again, implying that this is not just a normal traffic stop, which was the only basis the officers had for stopping this vehicle. And instead- So by implying that they've got this expansive authority, Mr. Fogle is not giving knowing and voluntary consent. And instead, he's simply submitting to this implied authority of the officers. The final point- So if they had been- Go ahead. The final point, going back to whether the stop was prolonged, is simply- Again, there would be nothing to stop this from being used in every single traffic case. Again, if time is the only consideration, which is really all the state has because the officers aren't- They're not acting diligently. They're not doing anything to work towards the completion of the stop. So if time is the only consideration, and if we just, again, use a stopwatch to measure the Fourth Amendment, then if during any traffic stop, during the five minutes or ten minutes, whatever we're going to say is reasonable for a traffic stop, every traffic stop, police officers are going to be able to go on these fishing expeditions and go down this line of unrelated questioning. And there's simply no way to stop that from happening in every single case, if it's acceptable from what's been doing here. Even though there's no reason to do it in every single case. I mean, I don't see that- If we said that this stop was correct, I don't see how we're telling police officers, go ahead and ask about anything. They were looking at something, and he obliged by not using his turn signal. So they had a reason to stop him and talk to him. They had a reason to stop him. So two worlds crashed. They had a reason to stop him, but they did not have a reason to prolong the traffic stop by going down this route of unrelated questioning. Well, if he had said, and I don't mean anything by this, it's just a name in front of me, say, who'd you just drop off over there? Oh, it's my good friend Chris McCoy. What does Chris do? Oh, he's an appellate defender. Oh, fine, nice. Okay, let's finish the ticket. I mean, he can't-you said he can't ask anything that relates to something they've otherwise seen. But if that's going to prolong the traffic stop, now, as I said, they can do this in the right circumstances. If they're working on the traffic stop, maybe if there's some downtime or they're waiting on dispatch to find out if the license is valid, they can do this. But when they're not doing anything to work on the traffic stop, they can't just go on this route because necessarily the duration of the traffic stop will be prolonged. Unless there's any further questions. Thank you. Thank you, counsel, for your arguments. We will take the matter under advisement. We will issue a decision in due course, and we will stand in short recess to prepare for our next case.